ORDERED.

**Dated:  March 21, 2022**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No. 8:20-bk-03522-MGW
                                                                Chapter 7
Procom America, LLC,

      Debtor.
_____/

## MEMORANDUM OPINION ON
## SERVICE OF A SUBPOENA ON A FOREIGN NATIONAL

Under Federal Rule of Civil Procedure 45, a subpoena must be served by

"delivering a copy to the named person." Here, the Trustee wants to examine the

Debtor's principal, Peter Gaal, about (among other things) $10.2 million in transfers

the Debtor made to him (and other entities he controlled) during the year before this

bankruptcy case was filed. So the Trustee served Gaal, who is in Hungary, by serving

a copy of a subpoena on his U.S.-based counsel. Although Gaal received the

subpoena, he seeks to effectively quash it for three reasons: in his view, Rule 45 does

not permit substitute service on his counsel; even if Rule 45 does permit substitute

service, this Court's subpoena powers do not extend beyond the territorial limits of

the United States; and, in any event, the Hague Convention is the exclusive (or, at least, primary) means of obtaining discovery from a foreign national abroad.

Thirty-five years ago, in *Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa*, the United States Supreme Court rejected the Hague Convention as the exclusive (and primary) means of obtaining discovery from a foreign national abroad.[1] Instead, the Supreme Court held that whether a party must resort to the Hague Convention is governed by principles of international comity. Here, Gaal has failed to show that international comity requires the Trustee to bypass the Federal Rules of Civil Procedure in favor of the Hague Convention: for years, Gaal has done business in the United States; his company owes U.S.-based creditors more than $13 million; the Trustee issued the subpoena as part of fulfilling his statutory duties in a collective U.S. insolvency proceeding to marshal the U.S.-based Debtor's assets and liquidate them for the benefit of the Debtor's U.S.-based creditors; and Hungarian law, which Gaal contends would apply under the Hague Convention, would not permit the Trustee to obtain compelled testimony or pre-suit discovery from him. Thus, the Court concludes the Trustee was permitted to subpoena Gaal under Rule 45.

What's more, this Court concludes service of the subpoena on Gaal's counsel was proper. This Court, like many others, reads Rule 45, which requires a subpoena to be "delivered," to permit substitute service of a subpoena so long as the substitute

---

[1] 482 U.S. 522, 529, 541 – 42 (1987).

service is reasonably calculated to ensure the subpoena reaches the named person. Because Gaal and his counsel were aware of the Trustee's desire to examine him under Rule 2004; Gaal's counsel has actively represented him and has appeared on his behalf at multiple hearings in this case; Gaal's counsel has an ethical obligation to keep Gaal informed of the status of this case; and Gaal actually received the subpoena, the Court concludes service on Gaal's counsel was reasonably calculated to reach Gaal. And because Gaal was served by substitute service *within the United States*, Gaal is subject to the Court's subpoena power. The Court therefore declines to quash the Rule 2004 subpoena.

## I.    Background

Peter Gaal is no stranger to the United States.

More than a decade ago, Gaal, a Hungarian citizen, formed Procom America in the United States to operate military historical tours under the name Beyond Band of Brothers.[2] Gaal initially operated Procom out of offices in Lexington, Kentucky, before eventually moving the company's headquarters to Tampa, Florida.[3] Gaal— the company's sole member and Chief Executive Officer—would visit the company's Tampa headquarters five or six times a year, staying at an apartment he rented across the street.[4]

---

[2] Doc. No. 263-2, p. 110 – p. 112, l. 17.

[3] Doc. No. 263-2, p. 11, ll. 3 – 15; p. 38, ll. 5 – 19.

[4] Doc. No. 263-2, p. 10, l. 24 – p. 11, l. 2; p. 26, l. 20 – p. 27, l. 8; Doc. 312, Ex. A, p. 24, l. 2 – p. 25, l. 9; p. 127, ll. 9 – 23.

To obtain credit for the company, Gaal obtained a U.S. immigration visa, which, in turn, allowed him to obtain a Social Security card.[5] While the company was doing well—generating $10 million in revenue in 2018 and $16 million in revenue in 2019—Gaal received significant dividends: he received nearly $750,000 in dividends in 2019 alone.[6] Gaal paid taxes to the United States on those dividends (and other income); he also paid taxes on Procom's profits because he elected to have Procom treated as a disregarded entity for tax purposes.[7]

When the Debtor was in danger of failing, Gaal availed himself of federal and state insolvency laws. Initially, Gaal took advantage of Florida's assignment for the benefit of creditors statute.[8] And when two of the company's creditors filed an involuntary chapter 7 petition, Gaal did not object.

For the most part, Gaal has participated in this case. For instance, when the order for relief was ultimately entered, Gaal signed the Debtor's schedules.[9] Through counsel, he appeared at the very first hearing in this case, and he has appeared at

---

[5] Doc. No. 312, Ex. A, p. 45, l. 17 – p. 46, l. 16.

[6] Doc. No. 263-2, p. 23, l. 16 – p. 24, l. 21.

[7] Doc. No. 312, Ex. A, p. 31, ll. 4 – 24.

[8] Doc. No. 263-2, p. 32, l. 21 – p. 35, l. 1. Filing an "ABC" might seem like a curious choice for "reorganizing" a business. An ABC is more akin to a chapter 7 bankruptcy. But Gaal apparently believed an ABC would allow him to find a new investor for the business. Doc. No. 263-2, p. 55, ll. 2 – 22.

[9] Doc. No. 70.

every hearing but one since.[10] Gaal also appeared by telephone at the section 341 meeting of creditors and answered questions on the Debtor's behalf.

But, when the Trustee sought to compel Gaal's attendance at a Rule 2004 examination so that the Trustee could examine him about (among other things) $10 million in transfers the Debtor made to him (and other entities he controls) during the one year before this case was filed, Gaal asserted his Hungarian citizenship as a shield.

Specifically, the Trustee noticed Gaal (and corporate representatives of other Procom-related entities) for a Rule 2004 examination via Zoom. To serve Gaal, the Trustee e-mailed a copy of a Rule 2004 subpoena to Gaal's counsel.[11] When she received the subpoena, Gaal's counsel notified the Trustee that she was not authorized to accept service for Gaal.[12] And Gaal refused to appear for his Rule 2004 exam.[13]

So the Trustee moved to compel Gaal's attendance.[14] The Court granted the Trustee's motion and ordered Gaal to appear—via Zoom—for a Rule 2004

---

[10] Doc. Nos. 29, 50, 87, 184, 246, 280, 288, 317, 341 & 347.

[11] Doc. No. 272, ¶ 9.

[12] Doc. No. 272, ¶ 9.

[13] Doc. No. 263, ¶ 15.

[14] Doc. No. 263, ¶ 16.

examination within forty-five days.[15] Gaal now asks the Court to reconsider its Rule 2004 order and effectively quash its subpoena.[16]

## II.    Conclusions of Law

In support of his reconsideration motion, Gaal raises three arguments. First, Gaal contends service of the Rule 2004 subpoena on his counsel was improper.[17] Second, even if service was proper, Gaal contends this Court's subpoena power does not extend to non-residents outside the United States.[18] Third, Gaal contends the only way for the Trustee to compel him to appear for a Rule 2004 exam is for the Trustee to first comply with the Hague Convention,[19] which the Trustee has not done.[20] Thus, this Court must decide whether service of the subpoena on Gaal's counsel was valid and, whether it was or wasn't, whether the Trustee needs to comply with the Hague Convention to compel Gaal's appearance for his Rule 2004 examination.

---

[15] Doc. No. 265, ¶ 3.

[16] Doc. No. 272, ¶¶ 7 – 13.

[17] Doc. No. 272, ¶¶ 7 – 9.

[18] Doc. No. 272, ¶ 10.

[19] Doc. No. 272, ¶¶ 9 – 10 (citing Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters).

[20] Doc. No. 272, ¶ 11.

### A.    Service of the subpoena on Gaal's counsel satisfied Rule 45.

Service of a Rule 2004 subpoena is governed by Rule 45 of the Federal Rules of Civil Procedure.[21] Rule 45 provides that a subpoena must be served by "delivering a copy [of the subpoena] to the named person."[22] Whether the Trustee complied with Rule 45's mandate to deliver a copy of the Rule 2004 subpoena to Gaal turns on two questions: Does Rule 45 permit substitute service? If so, was service on Gaal's counsel proper substitute service?

### 1.    Rule 45 permits substitute service.

As numerous courts have recognized, there is a split of authority over whether substitute service is permissible.[23] To date, the Eleventh Circuit Court of Appeals has not weighed in on that issue.[24] But it appears the recent trend by federal courts in

---

[21] Local Rule 2004-1(f) ("No subpoena is necessary to compel the attendance of, or the production of documents or electronically stored information by, the debtor at an examination of the debtor. A subpoena is necessary to compel the attendance of, or production of documents or electronically stored information by, a witness other than the debtor. The provisions of Fed. R. Civ. P. 45 apply to subpoenas issued under this rule.").

[22] Fed. R. Civ. P. 45(b)(1).

[23] *See, e.g., Rainey v. Taylor*, 2019 WL 1922000, at *2 (S.D. Fla. Apr. 30, 2019) ("There is a split among the circuits as to whether delivery of the subpoena requires personal delivery."); *TracFone Wireless, Inc. v. SCS Supply Chain LLC*, 330 F.R.D. 613, 616 (S.D. Fla. 2019) (acknowledging contrary authority on whether Rule 45 requires personal service); *Castleberry v. Camden Cnty.*, 331 F.R.D. 559, 561 (S.D. Ga. 2019) ("The Eleventh Circuit Court of Appeals has not fully resolved the need for personal service of a Rule 45 subpoena[s], and district courts have reached different conclusions.")

[24] *See, e.g., Rainey*, 2019 WL 1922000, at *2 (explaining that "[t]he Eleventh Circuit has not yet ruled on whether Fed. R. Civ. P. 45 requires personal service"); *TracFone Wireless, Inc.*, 330 F.R.D. at 616 (noting that "the Eleventh Circuit has not weighed in on this issue"); *Castleberry*, 331 F.R.D. at 561 (explaining that "[t]he Eleventh Circuit Court of Appeals has not fully resolved the need for personal service of a Rule 45 subpoena[s]").

Florida is to permit substitute service.[25] Chief Bankruptcy Judge Emeritus A. Jay
Cristol, nearly fifteen years ago in *In re Falcon Air Express*, provided perhaps the most
thoughtful analysis of why reading Rule 45 to permit substitute service is the better
view.[26]

      To begin, Judge Cristol noted, as have many other courts, that "[n]othing in
the language of Rule 45 requires *personal service*."[27] Instead, Rule 45 only requires
"delivery" of a subpoena.[28] What's more, Rule 45 requires the party serving a
subpoena to file a proof of service "showing the date *and manner* of service."[29] As
Judge Cristol noted, the requirement to set forth the *manner* of service would be
superfluous if Rule 45 mandated personal service.[30] Finally, Judge Cristol noted that

---

[25] *See, e.g., Rainey*, 2019 WL 1922000, at *2 (explaining that "many courts in this jurisdiction have
declined to quash a subpoena when service was reasonably designed to ensure actual receipt of the
subpoena") (citing *In re MTS Bank*, 2018 WL 1718685, at *4 (S.D. Fla. Mar. 16, 2018); *S.E.C. v. Rex
Venture Grp., LLC*, 2013 WL 1278088, at *2 (M.D. Fla. Mar. 28, 2013)); *TracFone Wireless, Inc.*, 330
F.R.D. at 616 (explaining that "substantial recent authority from federal courts in Florida support
that Rule 45 does not require personal service; rather, it requires service reasonably calculated to
ensure receipt of the subpoena by the witness") (citing *TracFone Wireless, Inc. v. Nektova Grp., LLC*,
328 F.R.D. 664, 667 (S.D. Fla. 2019); *In re MTS Bank*, 2018 WL 1718685, at *4 n.3 (S.D. Fla. Mar.
16, 2018); *Bozo v. Bozo*, 2013 WL 12128680, at *1 (S.D. Fla. Aug. 16, 2013); *S.E.C. v. Rex Venture
Grp., LLC*, 2013 WL 1278088, at *3 (M.D. Fla. March 28, 2013); *TracFone Wireless, Inc. v. Does 1-5*,
2011 WL 4711458, at *4 (S.D. Fla. Oct. 4, 2011); *In re Falcon Air Express, Inc.*, 2008 WL 2038799, at
*1, *4 (Bankr. S.D. Fla. May 8, 2008)).

[26] 2008 WL 2038799 (Bankr. S.D. Fla. May 8, 2008).

[27] *Id.* at *2 (emphasis added).

[28] *Id.*

[29] Fed. R. Civ. P. 45(b)(4).

[30] *Falcon Air Express*, 2008 WL 2038799, at *3. Judge Cristol also noted that, if "delivering" a
subpoena required "personal service," then use of the word "personally" in Federal Rule of Civil
Procedure 4(e)(2)(A), which provides that an individual may be served by "delivering a copy of the
summons and of the complaint to the individual personally," would likewise be superfluous. *Id.*

reading Rule 45 to require "personal service" of a subpoena would lead to a perverse outcome: the standard for service of a subpoena on a nonparty witness under Rule 45 would be more rigorous than the standard for serving a summons and complaint under Rule 4, which permits substitute service.[31]

This Court agrees with—and adopts—Judge Cristol's reasoning in *In re Falcon Air Express*. Thus, this Court concludes that Rule 45 permits service of a subpoena by substitute service. That leaves the question whether substitute service on Gaal's counsel was effective.

### 2. Substitute service of the subpoena on Gaal's counsel was reasonably calculated to reach Gaal.

Courts generally agree on the standard for determining whether substitute service is effective: substitute service is effective if service was "reasonably calculated" to ensure that the witness received the subpoena.[32] Whether service is "reasonably calculated" to ensure the witness received the subpoena is, of course, a fact-intensive inquiry.[33] As Bankruptcy Judge Robert Mark observed three years ago

---

[31] *Id.*

[32] *In re Viacao Itapemirim, S.A.*, 608 B.R. 268, 272 – 73 (Bankr. S.D. Fla. 2019) ("Although the Court is vacating its Order Granting Motion to Quash, the Court adopts its legal conclusion in that order, namely that Rule 45 allows for substitute service of a subpoena and that the relevant inquiry is whether service of the subpoena was 'reasonably calculated' to ensure receipt of the subpoena by the deponent.") (citations omitted); *Reiterman v. Abid*, 2019 WL 6114945, at *1 (M.D. Fla. Nov. 18, 2019) ("While personal service typically occurs, courts do not require personal service but require service reasonably calculated to ensure receipt of the subpoena by the witness.")

[33] *Viacao Itapemirim*, 608 B.R. at 273 ("Ultimately, whether service is "reasonably calculated" to reach a deponent is a fact-specific inquiry.").

in *In re Viacao Itapemirim*, courts have found a variety of ways in which service was "reasonably calculated" to reach the witness.[34]

For instance, courts have upheld service of a subpoena by first class U.S. mail;[35] service by certified mail;[36] service by certified mail and Federal Express;[37] and service by e-mail and U.S. mail.[38] Other courts have upheld service of subpoenas that were served on a deponent's spouse.[39] Still others have upheld service of process on a witness' housekeeper.[40] But the Court is unaware of any cases upholding service of a subpoena, under Rule 45, on a witness' lawyer.[41]

---

[34] *Id.*

[35] *Codrington v. Anheuser-Busch, Inc.*, 1999 WL 1043861, at * 1 – 2 (M.D. Fla. Oct. 15, 1999).

[36] *Cordius Trust v. Kummerfeld*, 2000 WL 10268, at *2 (S.D.N.Y. Jan. 3, 2000).

[37] *S.E.C. v. Rex Venture Grp., LLC*, 2013 WL 1278088, at *1 – 2 (M.D. Fla. Mar. 28, 2013).

[38] *In re Pacifico Sur Grp. LLC*, 2020 WL 3120327, at *2 – 3 (Bankr. S.D. Fla. June 11, 2020).

[39] *CresCom Bank v. Terry*, 269 F. Supp. 3d 708, 711 (D.S.C. 2017); *In re Falcon Air Express, Inc.*, 2008 WL 2038799, at *4 (Bankr. S.D. Fla. May 8, 2008).

[40] *Bozo v. Bozo*, 2013 WL 12128680, at *1 (S.D. Fla. Aug. 16, 2013).

[41] Gaal claims "[c]ase law is uniform in holding that Rule 45 does not permit a subpoena to be served on counsel for a party." Doc. No. 284-1 at 5. In support, Gaal cites the Fifth Circuit Court of Appeals' decision nearly sixty years ago in *Harrison v. Prather*, as well as a district court decision from 2008 describing *Harrison* as "binding precedent." *Id.* (citing *Harrison v. Prather*, 404 F.2d 267 (5th Cir. 1968); *Monex Fin. Servs., Ltd. v. Nova Info. Sys.*, 2008 WL 5235135, at *2 (M.D. Fla. Dec. 15, 2008)). To be sure, decisions by the Fifth Circuit Court of Appeals before October 1, 1981 are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981). But the Fifth Circuit, in *Harrison*, did not hold that service of a subpoena on a witness' lawyer is ineffective. A statement to that effect—service of a subpoena on a witness' lawyer "was not served in conformity" with Rule 45—was included in a district court order that was appended to the Fifth Circuit's opinion. 404 F.2d at 273. Although the district court's order was appended to the Fifth Circuit opinion, the district court order was incorporated into the Fifth Circuit opinion only insofar as the reasoning in the district court order pertained to the issues on appeal. *Id.* at 268 ("The judgment of the District Court dismissing this suit as to the defendant, William Prather, is affirmed for the reasons well expressed in the written opinion of Judge Claude F. Clayton (unpublished and therefore appended hereto) insofar as those reasons pertain to the issues on appeal in this matter."). The issues on appeal were limited

Courts have considered service on a lawyer under Federal Rule of Civil Procedure 4(f), however.[42] Rule 4(f) provides three ways to serve a summons and complaint on an individual in a foreign country, including by "any means" ordered by the court (assuming the means are not prohibited by international agreement).[43] Service by "any means" ordered by the court must comport with due process requirements, which means the method of service must be "reasonably calculated" to apprise the defendant of the action and give the defendant a chance to respond.[44]

---

to whether the district court correctly dismissed the plaintiff's lawsuit. *Id.* at 268 – 69. Because the appeal had nothing to do with service of the subpoena, the district court statement was not even incorporated into the Fifth Circuit opinion—let alone a holding by the Fifth Circuit.

[42] Doc. No. 275 at 8 (citing *See, e.g., Zanghi v. Ritella*, 2020 WL 589409, at *7 (S.D.N.Y. Feb. 5, 2020); *Wash. State Inv. Bd. v. Odebrecht S.A.*, 2018 WL 6253877, at *4; (S.D.N.Y. Sept. 21, 2018); *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, 2015 WL 998455, at *4 – 5 (S.D.N.Y. Mar. 5, 2015); *Atlantica Holdings, Inc. v. BTA Bank JSC*, 2014 WL 12778844, at *3 (S.D.N.Y. Mar. 31, 2014); *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 515 (S.D.N.Y. 2013); *In re GLG Life Tech. Corp. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012); *Arista Records LLC v. Media Servs. LLC*, 2008 WL 563470, at *2 (S.D.N.Y. Feb. 25, 2008); *RSM Prod. Corp. v. Fridman*, 2007 WL 2295907, at *6 (S.D.N.Y. Aug. 10, 2007); *Ehrenfeld v. Salim a Bin Mahfouz*, 2005 WL 696769, at *2 – 3 (S.D.N.Y. Mar. 23, 2005)).

[43] Fed. R. Civ. P. 4(f)(1) – (3).

[44] *Abercrombie & Fitch Trading Co. v. 7starzone.com*, 2014 WL 11721486 (S.D. Fla. Mar. 11, 2014) ("Federal Rule of Civil Procedure 4(f)(3) provides for alternate methods of service of process, so long as these are 'not prohibited by international agreement, as the court orders.' Courts have discretion to determine the appropriate means of service in a given case. *In exercising this discretion, the court must ensure that the alternative method of service of process comports with general due process requirements. This means that the alternative method of service must provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'*") (citations omitted); 1 James Wm. Moore et al., Moore's Federal Practice ¶ 4.52[3] (2021) ("To comport with due process, the method of service ordered by the district court [under Rule 4(f)3] must be reasonably calculated to apprise the defendant of the action and afford an opportunity to respond. For example, although an attorney generally is not an agent for receipt of service of process, several courts have permitted foreign defendants to be served under Rule 4(f)(3) by substituted service on a domestic attorney for the defendant.").

Numerous courts have held that service on a foreign national's domestic counsel is "reasonably calculated" to give notice and an opportunity to respond to a foreign national.[45] Take, for example, a decision out of the Southern District of New York nine years ago in *Jian Zhang v. Baidu.com Inc.*[46]

There, the plaintiffs sought permission under Rule 4(f)(3) to serve a defendant, who was located in China, in one of four ways.[47] One of those ways was by service on the defendant's domestic (New York) counsel.[48] After noting that service on counsel is a "common form of service ordered under Rule 4(f)(3)," the court considered whether service on counsel would satisfy due process.[49] In deciding that service on domestic counsel would satisfy due process, the court noted (among other factors) that the defendant had actual notice of the lawsuit; the defendant's counsel had been representing the company for nine months; and there was evidence of "adequate communication" between the defendant and its counsel.[50]

---

[45] *See, e.g., NYKCool A.B.*, 2015 WL 998455, at *4 – 5; *Atlantica Holdings, Inc.*, 2014 WL 12778844, at *2 – 3; *Jian Zhang*, 293 F.R.D. at 515; *In re GLG Life Tech.*, 287 F.R.D. at 267; *Arista Records LLC*, 2008 WL 563470, at *2; *RSM Prod. Corp.*, 2007 WL 2295907, at *6; *Ehrenfeld*, 2005 WL 696769, at *2 – 3.

[46] *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508 (S.D.N.Y. 2013).

[47] *Id.* at 515.

[48] *Id.*

[49] *Id.*

[50] *Id.*

Another decision out of the Southern District of New York also permitted service of process on counsel. In *In re GLG Life Tech Corporation Securities Litigation*, the plaintiffs sued GLG Life Tech Corporation, as well as its Chief Executive Officer (Luke Zhang) and Chief Financial Officer (Brian Meadows).[51] Although the plaintiffs were able to serve GLG Life Tech and Meadows, they were unable to serve Zhang because he was in China, and they did not have his address.[52] So the plaintiffs sought permission to serve Zhang by serving GLG Life Tech's U.S.-based counsel.

Starting with the proposition that a party seeking to effect service on counsel under Rule 4(f)(3) must demonstrate that counsel is adequately communicating with his or her client, the court noted that it was "virtually guaranteed" that GLG Life Tech's counsel would give notice to Zhang because "it is impossible to imagine that a corporation's attorney would not advise the corporation's Chairman and Chief Executive Officer of the fact that service destined for that officer had been made upon its attorney."[53] And, according to the court, it was obvious that GLG Life Tech, which had already been served, would have also told its CEO of a lawsuit against him.[54] Because service on GLG Life Tech and its counsel was "certain to

---

[51] 287 F.R.D. 262, 263 – 64 (S.D.N.Y. 2012)

[52] *Id.*

[53] *Id.* at 267.

[54] *Id.*

apprise Zhang of the pendency" of the lawsuit, the court concluded that service on counsel satisfied due process.[55]

Although *Zhang* and *GLG Life Tech Corp.* involved service under Rule 4(f), they are still instructive because the standard for determining whether service is effective is essentially the same: the method of service must be reasonably calculated to give notice and an opportunity to respond. Here, the facts are similar to those in *Zhang* and *GLG Life Tech Corp.*, where service was found to be reasonably calculated to give notice.

Here, the Trustee served a subpoena on Gaal's counsel. Gaal's counsel is actively representing Gaal in this bankruptcy case. By the time the subpoena had been served, Gaal's counsel had appeared on Gaal's behalf at five hearings, as well as at the section 341 meeting of creditors.[56] The possibility of a Rule 2004 exam was discussed at the 341 meeting.[57] And, in addition to being served with a copy of the Rule 2004 subpoena, Gaal's counsel received copies of the Trustee's omnibus notice of taking the Rule 2004 examination of Gaal (and others).[58] As a member of the Florida Bar, Gaal's counsel had a duty to keep Gaal reasonably informed about this

---

[55] *Id.* at 267 – 68.

[56] Doc. Nos. 29, 50, 87, 184, 246 & 263-2.

[57] Doc. No. 263-2, p. 39, l. 25 – p. 40, l. 8.

[58] Doc. No. 260-1.

matter.[59] The Court has no doubt that Gaal's counsel—a highly respected bankruptcy lawyer—fulfilled that duty. Nor is there any reason to doubt there was adequate communication between Gaal and his counsel. On those facts, it was, like in *GLG Life Tech Corp.*, virtually guaranteed that Gaal's counsel would provide the subpoena to Gaal.

And, in fact, that's what happened: Gaal's counsel provided him a copy of the subpoena. So Gaal had actual notice of it. "Although actual notice is not, alone, a determinative factor, it is a significant factor, particularly in this case where the Court is analyzing the sufficiency of service on the principal of a corporate debtor."[60] On the facts of this case—a Debtor's principal is actively represented by counsel in a bankruptcy case; counsel has appeared on the principal's behalf at multiple hearings; counsel and the Debtor's principal are aware the Trustee intends to take the principal's Rule 2004 exam; the Trustee serves a Rule 2004 subpoena on the principal's counsel; and the principal actually receives it—the Court concludes that service was "reasonably calculated" to reach Gaal.

### B.    The Court's Rule 45 power extends to Gaal.

Even if the Trustee was permitted to serve the Rule 2004 subpoena on his counsel, Gaal contends the subpoena is nonetheless ineffective because "the subpoena power of the Federal Courts under Rule 45 does not extend to non-resident

---

[59] R. Regulating Fla. Bar 4-1.4(a)(3).

[60] *In re Pacifico Sur Grp. LLC*, 2020 WL 3120327, at *3 (Bankr. S.D. Fla. June 11, 2020).

aliens, such as Mr. Gaal, outside of the United States."[61] In support of that

argument, Gaal cites (among other cases) *Maid of the Mist Corp. v. Alcatraz Media,*

*LLC*, for the proposition that subpoenas served on foreign nationals "*outside of the*

*United States . . .* are unenforceable because this Court has no subpoena power or

jurisdiction outside of the United States over [the foreign nationals]."[62] That's true so

far as it goes.

But here, Gaal, unlike the foreign national in *Maid of the Midst*, was not served

*outside* the United States. Rather, he was served by substitute service *inside* the United

States. When a foreign national is served in the United States, the foreign national is

subject to the Court's subpoena power.[63]

A good example is a decision six years ago out of the Southern District of

New York: *Probulk Carriers Ltd. v. Marvel International Management & Transportation.*[64]

In that case, the plaintiff served a Turkish citizen with two subpoenas while he was

in Boston attending a film festival.[65] The Turkish citizen moved to quash the

subpoena because the "Federal Rules of Civil Procedure do not allow for the service

---

[61] Doc. No. 272, ¶ 10.

[62] *Id.* (quoting *Maid of the Midst Corp. v. Alcatraz Media, LLC*, 2006 U.S. Dist. LEXIS 79872, at *5 (W.D.N.Y. Nov. 1, 2006)) (emphasis added).

[63] *Probulk Carriers Ltd. v. Marvel Int'l Mgmt. & Transp.*, 180 F. Supp. 3d 290, 292 (S.D.N.Y. 2016).

[64] *Id.*

[65] *Id.*

of subpoenas on foreign nonparty witnesses."[66] Noting that Rule 45 "does not distinguish between witnesses who are citizens or residents of the United States and witnesses who are not," the court concluded that the plain language of Rule 45 authorizes service of a subpoena "at any place *within the United States*."[67] Because Gaal was served inside the United States by substitute service, Gaal is subject to this Court's subpoena power.

### C.    The Trustee need not comply with the Hague Convention.

Gaal argues that "[t]o the extent the Trustee seeks documents or information from [him], the Trustee must follow the procedures set forth in the Hague Evidence Convention adopted by the United States and Hungary."[68] Gaal's argument is premised on the notion that the Hague Convention is the exclusive means for obtaining discovery from a foreign national.

But the United States Supreme Court expressly rejected that argument thirty-five years ago in *Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa*.[69] There, the plaintiffs sued two aircraft manufacturers (which

---

[66] *Id.*

[67] *Id.* (citing 9 James Wm. Moore, Moore's Federal Practice ¶ 45.22[1] (3d ed. 2015) (presence of individual within district is sufficient to subject that individual to service of a subpoena, unless the individual is immune from service); *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) (rejecting due process challenge to subpoena served on foreign partnership by service on a partner present in New York); *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995) (upholding exercise of jurisdiction over citizen of foreign country served while visiting New York)) (emphasis added).

[68] Doc. No. 272, ¶ 11.

[69] 482 U.S. 522 (1987).

were owned by the Republic of France) in federal court.[70] While the suit was

pending, the plaintiffs sought discovery from the aircraft manufacturers under the

Federal Rules of Civil Procedure.[71] The aircraft manufacturers moved for a

protective order, arguing that, because they were French corporations and the

discovery could only be found in France, "the Hague Convention dictated the

exclusive procedures that must be followed for pretrial discovery."[72]

On appeal, the Supreme Court rejected the aircraft manufacturers' argument

that the Hague Convention was the exclusive means for obtaining discovery from a

foreign national:

> In the District Court and the Court of Appeals, [the
> aircraft manufacturers] contended that the Hague
> Evidence Convention "provides the exclusive and
> mandatory procedures for obtaining documents and
> information located within the territory of a foreign
> signatory." *We are satisfied that the Court of Appeals correctly
> rejected this extreme position.* We believe it is foreclosed by
> the plain language of the Convention.[73]

Rejecting the Hague Convention being the exclusive means for obtaining discovery

abroad, the Supreme Court concluded that "the text of the [Hague] Evidence

Convention, as well as the history of its proposal and ratification by the United

---

[70] *Id.* at 524 – 25.

[71] *Id.* at 525 – 26.

[72] *Id.*

[73] *Id.* at 529 (emphasis added) (citation omitted).

States, unambiguously supports the conclusion that it was intended to establish

*optional* procedures that would facilitate the taking of evidence abroad."[74]

Not only did the Supreme Court reject the Hague Convention as the *exclusive*

means for obtaining discovery abroad, but it also rejected the Hague Convention as

the *primary* means of obtaining foreign discovery, too:

> Petitioners contend that even if the Hague Convention's
> procedures are not mandatory, this Court should adopt a
> rule requiring that American litigants first resort to those
> procedures before initiating any discovery pursuant to the
> normal methods of the Federal Rules of Civil Procedure. . . .
> [W]e cannot accept petitioners' invitation to announce a
> new rule of law that would require first resort to Convention
> procedures whenever discovery is sought from a foreign
> litigant.[75]

In the end, the Court concluded that in determining when a party must resort to the

Hague convention to obtain discovery, trial courts must consider principles of

comity.[76]

In a footnote, the Supreme Court articulated five factors that should guide a

trial court's comity analysis:

> (1)    the importance to the . . . litigation of the
>        documents or other information requested;

---

[74] *Id.* at 538.

[75] *Id.* at 541 – 42.

[76] *Id.* at 545 – 46; *see also First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) ("The Hague Convention is not the exclusive means for obtaining discovery from a foreign entity. Nor is the Convention necessarily the means of first resort. The Supreme Court in *Aérospatiale* declined to announce any fixed rule on this subject, at the same time suggesting that concerns of international comity require that 'American courts . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.'") (citations omitted).

      (2)    the degree of specificity of the request;

      (3)    whether the information originated in the United States;

      (4)    the availability of alternative means of securing the information; and

      (5)    the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.[77]

Here, Gaal fails to demonstrate that principles of international comity weigh in favor of forcing the Trustee to resort to the Hague Convention.[78]

At a hearing, Gaal's counsel argued that under the Hague Convention, Hungary doesn't allow for compelled testimony or pre-suit discovery. Of course, the existence of a foreign statute prohibiting discovery does not, by itself, limit a litigant to the Hague Convention. The Supreme Court said as much in *Aérospatiale*:

It is well settled that such statutes do not deprive an American court of the power to order a party subject to its

---

[77] *Id.* at 544 n.28 (quoting Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986)).

[78] *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45 (D.D.C. 2000) ("*Aerospatiale* did not specifically rule on the burden of proof for these factors, but most courts have placed this burden on the party seeking to require first-use of the Convention."); *Rich v. KIS Calif., Inc.*, 121 F.R.D. 254, 258 (M.D.N.C. 1988) (explaining that "[t]he proponent of using the Hague Evidence Convention bears the burden of demonstrating the necessity for using those procedures"); *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 354 (D. Conn. 1991) (the party urging use of the Hague Convention bears the burden of proof of persuading the trial court); *Benton Graphics v. Uddeholm Corp.*, 118 F.R.D. 386, 388 – 89 (D.N.J. 1987) (party seeking to utilize Convention procedures must demonstrate appropriate reasons); *Doster v. Carl Schenk A.G.*, 141 F.R.D. 50, 51 – 52 n.3 (M.D.N.C. 1991) ("[I]t is more practical, if not logical, to place the burden of persuasion on the proponent of using the Hague Convention."); *Valois of Am., Inc. v. Risdon Corp.*, 183 F.R.D. 344, 346 (D. Conn. 1997) (same).

> jurisdiction to produce evidence even though the act of
> production may violate that statute. Nor can the
> enactment of such a statute by a foreign nation require
> American courts to engraft a rule of first resort onto the
> Hague Convention, or otherwise to provide the nationals
> of such a country with a preferred status in our courts. It is
> clear that American courts are not required to adhere
> blindly to the directives of such a statute.[79]

That is not to say a Hungarian statute prohibiting discovery is irrelevant. To the contrary, such a statute is relevant to identifying the interests of the foreign state—one of the factors this Court should consider as part of its comity analysis.[80]

But to the extent the Hungarian "blocking statute" identifies a Hungarian interest, that interest is outweighed by the interests of the United States. Gaal formed a company in the United States that sold tens of millions of dollars of tours to U.S. citizens, earning Gaal nearly a million dollars in dividends in 2019 alone. When the company went out of business in 2020, it owed unsecured creditors (mostly customers) roughly $13.4 million.[81] During the year before the company went out of business, it transferred more than $10.2 million (from U.S. banks) to Gaal and companies he owns or controls.[82] The Trustee has issued the Rule 2004 subpoena as part of fulfilling his statutory duty to investigate the Debtor's financial affairs,

---

[79] 482 U.S. at 54 n.29.

[80] *Id.* ("The blocking statute thus is relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material.")

[81] Doc. No. 70, *Summary of Assets & Liabilities for Non-Individuals.*

[82] Doc. No. 70, *Statement of Financial Affairs.*

marshal the estate's assets (including avoidance actions), and liquidate the estate's assets for the benefit of the estate's creditors (most, if not all, of whom are U.S. citizens).[83]

Based on the Court's review of the Rule 2004 subpoena,[84] the documents the Trustee seeks are critical to him fulfilling his statutory duties. The Trustee's document requests (and the list of topics he seeks to examine Gaal and others about) are specific. It appears much of the information responsive to those requests may have originated in the United States. For instance, many of the document requests seek communications or documents between the Debtor and third parties. Given that the Debtor operated in the United States, any communications presumably would have originated in the United States. And, if what Gaal says about Hungarian law is true (i.e., Hungarian law prohibits pre-suit discovery and compelled testimony), there is no alternative means of securing the information the Trustee seeks.[85]

On this last point, Gaal argues that the Debtor's former office managers—Nikki Montgomery and Deborah Watkins—are both U.S. citizens who would be

---

[83] 11 U.S.C. § 704(a) (setting forth the trustee's duties).

[84] Doc. No. 263-3.

[85] Although there is no alternative means for the Trustee to obtain the information he seeks, there are alternative means for affording Gaal (at least some) of the protection presumably afforded by the Hungarian blocking statute. For instance, Rule 45(d) requires a party issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Moreover, Rule 45(d)(3) also provides that a court *must* quash a subpoena that requires disclosure of privileged or other protected matter or that imposes an undue burden. Fed. R. Civ. P. 45(d)(3)(A)(iii) – (iv). Rule 45 also provides that a court *may* quash a subpoena that requires disclosure of a trade secret or other confidential research, development, or commercial information. Fed. R. Civ. P. 45(d)(3)(B)(i).

available to testify at a Rule 2004 exam. But Ms. Montgomery left the company in early 2019.[86] So she would not have any information about transfers the Debtor made during the year before this case was filed, when more than $10 million was transferred to Gaal or entities he owned or controlled. And when asked who would know what happened to the millions the Debtor transferred during that time, the Debtor's accountant answered that Gaal would.[87] He did not mention Watkins.[88] Thus, Gaal has failed to convince the Court that the testimony of Montgomery or Watkins (or even both of them) is an adequate alternative for the information the Trustee seeks.

## III.  Conclusion

Peter Gaal started a business in the United States; obtained a U.S. Social Security card to help obtain credit for the business; and earned (at least) hundreds of thousands of dollars from that U.S. business. Now that a Trustee is seeking to liquidate that business to pay its creditors, who are owed more than $13 million, as part of a U.S. insolvency proceeding, principals of international comity dictate he ought to be able to avail himself of Rule 45 to obtain information from Gaal.

Having served Gaal with a subpoena within the United States using a method of substitute service that was reasonably calculated to ensure that Gaal received it,

---

[86] Doc. No. 312, p. 33, l. 24 – p. 34, l. 8.

[87] *Id.* at p. 134, l. 11 – p. 137, l. 14. The accountant also testified that the accountants at Procom Consulting (one of the recipients of the millions of dollars of transfers) would know, too. *Id.*

[88] *Id.*

Gaal is subject to this Court's subpoena power. The Court will therefore, by separate

order, deny Gaal's request to reconsider the Court's order compelling Gaal to

appear—via Zoom—for a Rule 2004 examination within forty-five days.

Attorney Robert F. Elgidely is directed to serve a copy of this Memorandum
Opinion on all interested parties who do not receive service by CM/ECF and to
file a proof of service within three days of entry of the Memorandum Opinion.

**Robert F. Elgidely, Esq.**
**Fox Rothschild LLP**
*Special Counsel to the Chapter 7 Trustee*

**Lynn Welter Sherman**
**Trenam, Kemker, Scharf, Barkin, Frey, O'Neill & Mullis, P.A.**
*Counsel for Peter Gaal*